**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 16-CR-00196 (ESH)** |
| | : | |
| v. | : | |
| | : | **TRIAL: June 7, 2017** |
| **CHARLES MORGAN** | : | |
| Defendant. | : | |

# NOTICE OF FILING

The government requests that the attached expert disclosure letter, dated March 23, 2017, be made part of the record in this case (without attachment).

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney

By:  \_\_\_\_/s/_____
LINDSAY SUTTENBERG
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

## Certificate of Service

A copy of the Notice of Filing was served via ECF to counsel for the defendant, Michelle Peterson, Esq. on March 23, 2017. All of the attachments were provided to counsel via mail on March 23, 2017.

\_\_\_\_/s/_____
LINDSAY SUTTENBERG
Assistant United States Attorney



U.S. Department of Justice

Channing D. Phillips
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

March 23, 2017

      RE:    <u>United States v. Charles Morgan</u>, 16-CR-196 (ESH)
            Re: *Expert Witness Notice Disclosures*

Dear Ms. Peterson:

      The purpose of this letter is to provide additional discovery and notice of the government's intent to call several expert witnesses at trial, to include (1) Federal Bureau of Investigation Special Agent Kevin Horan ("SA Horan"), as an expert in the analysis of cellular telephone records, (2) John Marsh, as an expert in the processing and recovering of digital evidence and in computer forensic analysis, (3) Laurissa Mitchell, as an expert in the field of serology and forensic DNA analysis , and (4) Nicole Kaye, as an expert in forensic DNA analysis and the specialized Y-STR method.

      (1)    **Special Agent Kevin Horan**

      SA Horan is a Special Agent in the FBI's Cellular Analysis Survey Team ("CAST").  SA Horan has been trained by the FBI and the major cellular telephone providers in this country to analyze cellular telephone call and tower data for the purpose of locating missing persons and suspected criminals.  SA Horan will testify that whether a cellular telephone ends up using a particular cell tower depends on various factors, including the strength and variance of signal, the distance from the cell site, the usage of the tower at the time, obstructions between the cellular telephone and tower, and density of towers in a particular area.

      SA Horan will testify with respect to the cell site information and data obtained from the cellular telephone records for J.T. at 202-867-XXXX (T-mobile carrier), and for the defendant at 202-367-4347 (Sprint carrier).  First, SA Horan will testify about the cell site information and data obtained from both J.T. and the defendant's cellular phones as it relates to the time frame of the sexual assault offenses on May 22-23, 2016.  Second, SA Horan will testify with respect to the cell site information and data obtained from the defendant's cellular telephone record during the time period generally between April 2015 and July 2016.

      SA Horan will testify that he uses modeling tools to determine the approximate range for a given tower and his experience in locating kidnap victims, missing persons and fugitives, as well as other tools, to assess the likely range for cell site activity for a particular date or location.  He will use the call and tower records for the cellular telephones referenced above.  Specifically,

he will look at calls made to and from these cellular telephones during the time-frames mentioned above, and explain which towers the cellular telephones used to connect calls.

Please find attached SA Horan's curriculum vitae, a four-page report of SA Horan's "experience and methodology," and SA Horan's powerpoint presentation as it relates to the sexual assault charges.[1]  SA Horan's powerpoint presentation as it relates to the SORNA charges will be forthcoming upon its completion by separate cover.

The current attachments, including the powerpoint presentation, identify the methods used and summary of the conclusions made as to the historical cell data locations. The attachments also contain explanations of the applicable technologies and provides the bases for his opinions and conclusions. Specifically, SA Horan will opine that the cellular phones are in the same geographic vicinity based on the information that is identified on page eight of the powerpoint presentation. SA Horan will also testify that based on the distance of the towers and the speed at which the cellular phone was pinging these towers (i.e., 12:09 am at CID 69-4, 12:11:50 at CID 20-3 and 12:12:32 at CID 44-2), it is his opinion that the cellular phone was traveling by way of a vehicle as opposed to by foot. Further, based on the direction of the triggering towers, the defendant's cellular phone was traveling toward Fort Davis Recreation Center from the vicinity of Randall Circle. SA Horan will also testify that by 1:03am, the defendant's cellular phone was using a tower consistent with the defendant being at his residence in Capital Heights, Maryland.

The bases for SA Horan's opinions and conclusion are his training and experience and his examination of the cellular telephone records (call detail records) and cell tower data in this case. The cellular telephone records (call detail records) and tower data upon which SA Horan relied in reaching his conclusions have already been provided to you.

(2)   **Investigator John Marsh**

The government intends to call John E. Marsh, a Criminal Investigator with the D.C. U.S. Attorney's Office, as an expert in the processing and recovering of digital evidence and in computer forensic analysis. Investigator Marsh will rely on his training and experience, as outlined in his curriculum vitiate (attached hereto), and on the work he performed in this case in offering his opinions.

Investigator Marsh conducted extractions of data stored on J.T.'s cellular device. Relevant information that the government intends to introduce at trial has been provided to you (a copy of the discovery letter is attached hereto for your convenience). The full extraction report is available at the United States Attorney's Office if you wish to review it.

Investigator Marsh has specific knowledge relating to the storage of electronic material on mobile phone and electronic devices, and how such digital information can be accessed or copied. He will testify that such electronic information is stored in the hardware of the phone and that such information can be extracted through the use of licensed hardware and software.

---

[1] Note that your copy has the victim's telephone number and address information redacted. The presentation also indicates that it is "draft-not final" only because SA Horan has not reviewed the slides for any spelling or grammatical errors. In the interest of getting you this information as soon as possible, we are providing the unedited draft version. If anything substantively changes between the draft and final presentation, the government will provide that to you by separate cover.

He will opine that such extraction processes can often recover deleted images, text messages or other information.  He will opine that he completed a forensic data extraction from J.T.'s cellular phone using standard operating procedures to ensure the proper and uncorrupted copying of such records from the phone into the extraction report.  He will also testify about the storage, retrieval and processing mechanisms that he followed in retrieving the information.

Investigator Marsh will testify specifically regarding his extraction of J.T.'s cellular phone that included J.T.'s web history information (showing that J.T. was checking for bus schedules), KIK communications between J.T. and the individual she had been intending to meet that evening, and text communications between J.T.'s cellular phone and the defendant's cellular phone as part of law enforcement's investigation.

As part of Investigator Marsh's explanation of how he was able to retrieve and extract this information from J.T.'s cellular phone, he will explain how the default for the extraction report is to indicate times reflected in Universal Time Coordinates (UTC), even though that may not be accurate.  Here, when comparing the UTC times that are reflected in the extraction report to the actual times reflected in the subscriber records and screen-shots of text communications and KIK communications (all of which you have in your possession), Investigator Marsh will explain that the extraction report's indication that the times are reflected in UTC is incorrect.  Rather, the times reflected in the extraction report are the actual times of the calls, communications, and internet browsing (that time being, Eastern Standard Time).

Additionally, Investigator Marsh will testify that based on his training and experience in cell phones, he is familiar with how cellular phones are manufactured and the parts involved.  Investigator Marsh will explain that cellular phones and their parts are manufactured all over the world.  Investigator Marsh will testify that cell phones and their parts are not manufactured in the District of Columbia.

(3)   **Laurissa Mitchell, Sorenson DNA Laboratory**

Laurissa Mitchell will be called as an expert in the field of serology and forensic DNA analysis.  As it relates to serology (or forensic biology), she will testify factually about the quality assurance measures taken to ensure the integrity of testing results, about serology generally and about the presumptive and confirmatory tests for the presence of semen, and how they are performed and interpreted.  Ms. Mitchell will also testify regarding what the possible outcomes and results of those tests represent and signify – in particular, she will opine with respect to the interpretation of the serological testing results in this case.  Specifically, Ms. Mitchell will explain why, if a condom was worn by an individual, it is substantially less likely that serology testing would identify semen on any evidence swabs and smears (because any semen would have remained inside the condom).  The bases for Ms. Mitchell's conclusions are her training and experience, her review of the testing and examinations performed, and her interpretation of the testing results.  The paperwork associated with the testing and examinations performed as it relates to the serology testing is included in the case file that has already been provided to you in discovery.

Ms. Mitchell will also testify regarding the procedures she used to obtain DNA results in this case. Ms. Mitchell will testify consistent with the DNA findings announced in the examination reports previously provided to you in discovery.  The government expects Ms. Mitchell to testify in the following general areas: what DNA is, and where it

is found in the body; whether DNA changes and how long DNA can last; the types of items that can be analyzed to get DNA; and what DNA testing involves, including a description of PCR and STR and the types of conclusions that can be reached from this type of testing. Ms. Mitchell's opinion is based on the analysis conducted in this case and the findings as noted in the worksheets and bench notes that have been provided to you in discovery.

Ms. Mitchell may use a powerpoint presentation to explain the framework of DNA as a demonstrative to her introductory testimony on DNA. This presentation will be provided to you upon completion by separate cover. A copy of Ms. Mitchell's curriculum vitae is attached.

(4) **Nicole Kaye, Signature Science DNA Laboratory**

Nicole Kaye will also be called as an expert in the field of forensic DNA analysis. Ms. Kaye will testify to the Y-STR testing conducted on the breast swab. She will explain Y-STR testing, the Y-STR testing process and the quality assurance measures taken to ensure the integrity of the results. She will describe some of the differences between STR DNA testing and Y-STR testing. She will state that although the testing methods are similar, each test examines something different. STR DNA testing examines numerous different chromosomes on an individual's DNA, while Y-STR testing looks at components on one single chromosome, i.e., the Y chromosome.

Ms. Kaye will discuss the results of the Y-STR testing on the breast swab. The paperwork associated with the testing and examinations performed as it relates to the Y-STR testing has already been provided to you in discovery. The case file is attached on disk.

The government may also ask Ms. Kaye why there may be no male DNA profile on a breast swab, despite a report that the perpetrator grabbed and kissed and/or licked the victim's breast. Ms. Kaye will explain how rare it is to get "touch DNA" from merely touching a part of the body. She will also explain multiple factors that could impact whether the perpetrator leaves behind a DNA sample on a victim's breast swab. For example, if the victim's breast was rubbed up against clothing (i.e. bra, t-shirt, etc) following the kissing and/or licking, that would impact whether the DNA was recoverable from the victim's breast swab. How much kissing and/or licking and how much time passed between the acts and the taking of the breast swab would also impact whether there was any traceable amount of male DNA left to detect on the breast swab.

A copy of Ms. Kaye's curriculum vitae is attached.

If you have any questions or otherwise wish to discuss this or any other matters relating to this case, please contact me at 202-252-7017.

                                                        Sincerely,

                                                        _____/s/_____
                                                        Lindsay Suttenberg
                                                        Andrea Hertzfeld
                                                        Assistant United States Attorneys

Enclosures